# United States Court of Appeals
### FOR THE EIGHTH CIRCUIT
_____

Nos. 95-2012/2074
_____

Jin Ku Kim,                          *
                                     *
    A p p e l l a n t / C r o s s - a p p e l l e e ,
  *
                                          *
    Appeals from the United States
       v .                           *
    District Court for the
                                          *
    Northern District of Iowa
Nash Finch Company,                  *
                                     *
    A p p e l l e e / C r o s s - a p p e l l a n t .
  *

_____

Submitted: December 14, 1995

Filed: August 20, 1997
_____

Before McMILLIAN and BEAM, Circuit Judges, and PERRY,[*]
District Judge.
_____

McMILLIAN, Circuit Judge.

    Jin Ku Kim appeals from a final judgment entered in
the District Court[1] for the Northern District of Iowa,

_____

    *The Honorable Catherine D. Perry, United States District Judge for the
Eastern District of Missouri, sitting by designation.

    [1]The Honorable Michael J. Melloy, Chief Judge, United States District Court for
the Northern District of Iowa.

upon a jury verdict, finding in his favor and against Nash Finch Co. in his employment discrimination case but reducing the amount of damages

awarded by the jury. For reversal, Kim argues the district court erred in denying his motion to amend the pleadings to conform to the evidence under Fed. R. Civ. P. 15(b) and in applying the Title VII cap, 42 U.S.C. § 1981a(b)(3), to limit compensatory and punitive damages. On cross-appeal, Nash Finch argues the district court erred in holding (1) Kim's claim that he was unlawfully denied a promotion from leadman to foreman in November 1990 was actionable under 42 U.S.C. § 1981, (2) there was sufficient evidence of intentional discrimination, (3) there was sufficient evidence of retaliation, (4) there was sufficient evidence of malice or reckless indifference to support punitive damages, and (5) the jury verdict awarding damages for lost wages and compensatory damages was supported by sufficient evidence or, in the alternative, was not excessive. For the reasons discussed below, we affirm the judgment of the district court.

BACKGROUND FACTS

Nash Finch is a wholesale and retail food distributor. In 1978 Kim, an American citizen of Korean ancestry, began working as a grocery picker in Nash Finch's Cedar Rapids warehouse. A superintendent runs the warehouse. During the period of time at issue Bill Mund was the warehouse superintendent. The four warehouse departments-- receiving, shipping, maintenance, and transportation-- are each supervised by a salaried "foreman." By October 1979, Kim was one of six hourly "leadmen" who assisted the warehouse shipping foreman; Kim also acted as shipping foreman on Saturdays and filled in when the shipping foreman was absent. The

shipping department has 80-90 employees; the full shipping crew can consist of up to 70 employees; on Saturdays, however, the shipping crew is smaller, about 25-40 employees.  For more than 10 years, Kim received "superior" or "outstanding" annual performance evaluations.

The position of shipping foreman became vacant in November 1990 and in April 1992.  Kim applied for both vacancies, but in each instance Nash Finch promoted

someone else.  The individual promoted in November 1990 was white, younger than Kim, had less than a year's experience as a leadman, had been trained by Kim, and had no formal education beyond high school.  The individual promoted in April 1992 was white, younger than Kim, had not worked in the warehouse for 10 years, had been trained by Kim, and had no formal education beyond high school.  In comparison, Kim was a college graduate and the senior leadman in the shipping department.  Nash Finch told Kim that he had not been promoted because of his inability to control costs and manhours, lack of aggressiveness, difficulty in controlling large crews, and poor temperament.  When Kim objected to being passed over for promotion, the Nash Finch EEO compliance officer advised Kim to file a complaint or consult a lawyer.  In May 1992 Kim filed an employment discrimination charge against Nash Finch with the Iowa Human Rights Commission and the Equal Employment Opportunity Commission, alleging Nash Finch unlawfully failed to promote him in November 1990 and in April1992 on the basis of race, national origin and age.

According to Kim, immediately after he filed his employment discrimination charge in May 1992, Nash Finch began to systematically retaliate against him.  For example, Nash Finch supervisors no longer assigned Kim to fill in for the shipping foreman, gave him much lower performance evaluations, orally warned him about his poor "attitude" (toward management), characterized him as unwilling to assume more job responsibility when he declined a Sunday shipping crew assignment, placed him under constant surveillance at work, and excluded him from meetings at work.  Nash Finch mischaracterized a September

1992 incident involving Kim and another employee as race-based, gave Kim a written reprimand about the incident, and placed the written reprimand in Kim's personnel file. Kim alleged Nash Finch fabricated the race basis of the incident in order to discredit him when the local civil rights commission was investigating his (Kim's) employment discrimination charge. In November 1992, after another incident involving a co-worker and another meeting with management, Nash Finch issued Kim a written reprimand about the incident. During the summer and fall of 1993, Nash Finch reviewed its warehouse operations with the

assistance of a consultant and discovered what it regarded as productivity problems, particularly with respect to the Saturday shipping crew, which Kim supervised, and required Kim to attend special retraining in order to improve productivity on Saturdays. Kim regarded this special retraining as punitive and humiliating in light of his status as a leadman, seniority and experience.

Kim continues to work for Nash Finch and has not been discharged, demoted, reduced in compensation, or reassigned; however, as noted above, he has received oral and written reprimands and has been required to attend special retraining. Brief for Appellee/ Cross-Appellant at 1.

DISTRICT COURT PROCEEDINGS

In November 1992 Kim received a right-to-sue letter and filed this lawsuit in federal district court. In count I Kim alleged that Nash Finch unlawfully discriminated against him on the basis of race, color, national origin, and age when it failed to promote him to the position of shipping foreman in April 1992 in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e, and the Age Discrimination in Employment Act (ADEA), as amended, 29 U.S.C. § 621 et seq. In count II Kim alleged that Nash Finch unlawfully discriminated against him on the basis of race, color, national origin, and age when it failed to promote him to the position of shipping foreman in

November 1990 in violation of 42 U.S.C. § 1981.[2]  In count III Kim alleged that Nash Finch unlawfully retaliated against him for filing an employment discrimination charge in violation of Title VII, 42 U.S.C. § 2000e-3(a). Kim sought back pay, promotion and other equitable relief, and compensatory and

---

[2]This claim was not barred by the two-year statute of limitations under Iowa Code Ann. § 614.1(2) (West Supp. 1997) because the failure-to-promote occurred on November 18, 1990, and the complaint was filed on November 16, 1992.

punitive damages, as well as attorney's fees and costs, including expert witness fees.

Nash Finch filed a motion for summary judgment, asserting that Kim had not been promoted because he had no transportation experience and because of his relatively weak management skills. The district court denied the motion for summary judgment and in September 1994 the case was tried to a jury. At trial Mund testified that he never seriously considered Kim for promotion because Kim lacked personal loyalty to him (Mund). Kim, his wife and his son testified about how Kim had suffered physically and emotionally from his adverse treatment by Nash Finch. Kim developed high blood pressure and headaches from stress and became anxious, withdrawn and depressed; he had difficulty sleeping and felt humiliated and ostracized at work.

In special verdicts, the jury found Nash Finch had discriminated against Kim on the basis of race but not age in failing to promote him to shipping foreman in November 1990 and in April 1992, and had retaliated against him for filing employment discrimination charges. The jury awarded Kim $15,000 in lost wages and benefits and $100,000 in non-economic damages (for emotional distress and loss of enjoyment of life) for the 1990 promotion claim, $21,000 in lost wages and benefits and $150,000 in non-economic damages for the 1992 promotion claim, and $1.5 million in non-economic damages for the retaliation claim. Finally, the jury awarded Kim $7 million in punitive damages. The special verdict permitted the jury to award punitive damages for either the 1992 promotion or the retaliation claim. Both parties filed post-trial motions.

The district court denied Nash Finch's motion for judgment as a matter of law or, in the alternative, for new trial, reduced the damages award, granted in part Kim's motion for equitable relief (for promotion to shipping foreman when available and front pay at the rate of $447 per month), denied Kim's motion for prejudgment interest, granted Kim's motion for attorney's fees and expenses, and entered judgment accordingly. <u>Jin Ku Kim v. Nash Finch Co.</u>, No. C92-0204 (N.D. Iowa Apr. 13, 1995)

(opinion and order). The district court held the evidence was sufficient to support the jury's finding that Nash Finch had intentionally discriminated against Kim on the basis of race, color or national origin when it failed to promote him in November 1990 and in April 1992. Slip op. at 4-6. The district court also held the evidence was sufficient to support the jury's finding that Nash Finch had retaliated against Kim for filing an employment discrimination charge. Id. at 6-10. The district court also held that the evidence was sufficient to support the jury's finding that Nash Finch had acted with malice or reckless indifference to Kim's federally protected right not to be retaliated against for filing a civil rights complaint. Id. at 11-12.

As discussed below, the parties disputed whether the 1992 promotion and retaliation claims were submitted under both Title VII and 42 U.S.C. § 1981 or only Title VII. The district court found that Kim had waived any argument that these claims had been brought under both statutes because Kim did not object to the jury instructions and the special verdict forms which submitted the 1992 promotion and retaliation claims under Title VII without referring to 42 U.S.C. § 1981. Id. at 15 (noting plaintiff failed to object to jury instructions). The district court also held that the Title VII statutory damages cap applied, thus limiting the award for non-economic damages and punitive damages for those claims to a maximum of $300,000. Id. at 16 (jury awarded $150,000 for the 1992 promotion claim and $1.5 million for the retaliation claim and $7 million in punitive damages; it was not disputed that Nash Finch has more than 500 employees; see 42 U.S.C. § 1981a(b)(4) ($300,000 maximum for compensatory and punitive

-11-

damages)).    The district court did not review the punitive damages award for excessiveness.    Id. at 14 (noting nonetheless that $300,000 was not excessive in view of duration of discrimination, level of retaliation and financial well-being of employer).[3] This appeal and cross-appeal followed.

---

[3]The district court reduced the jury verdict to a total of $421,000 ($21,000 for lost wages, $100,000 for compensatory damages for the 1990 promotion, and $300,000 for compensatory and punitive damages for the 1992 promotion and the retaliation claims).  The district court also ordered front pay ($447 per month), promotion to the next available foreman position (plus seniority from November 1990), attorney's fees, costs and expenses, and post-judgment interest.

ACTIONABLE § 1981 CLAIM-- 1990 PROMOTION

Nash Finch argues the district court erred in denying its motion for judgment as a matter of law on the 1990 promotion claim. Nash Finch argues the 1990 promotion claim is not actionable under 42 U.S.C. § 1981 because the promotion from leadman to foreman did not involve a significant change in duties, compensation or responsibility. We disagree.

In Patterson v. McLean Credit Union, 491 U.S. 164, 176-77, 182 (1989) (Patterson), the Supreme Court held 42 U.S.C. § 1981 prohibited racial discrimination in the formation of an employment contract but did not apply to "problems that may arise later from the conditions of continuing employment," that is, in the employment relationship. After Patterson, courts held that claims alleging discriminatory discharge could not be brought under § 1981. E.g., Taggart v. Jefferson County Child Support Enforcement Unit, 935 F.2d 947, 948 (8th Cir. 1991) (banc). Congress later enacted the Civil Rights Act of 1991 in part to correct what it regarded as the Court's erroneous construction of the scope of 42 U.S.C. § 1981 in Patterson. In § 101(2)(b) of the Act, 42 U.S.C. § 1981(b), Congress redefined the term "make and enforce contracts" specifically to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." The 1991 Act became effective on November 21, 1991. However, in Rivers v. Roadway Express, Inc., 511 U.S. 298 (1994), the Supreme Court held that § 101 should not be applied retroactively to pending cases or pre-enactment conduct. For this reason, Patterson and not the 1991 Act applies

to the 1990 claim because it occurred before November 21, 1991, the effective date of the 1991 Act.

Patterson held that the denial of a promotion is not actionable under § 1981 unless "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer." 491 U.S. at 185, citing Hishon v. King & Spaulding, 467 U.S. 69 (1984) (challenging refusal of law firm to promote associate to partnership under Title VII). Not every refusal to promote violates Patterson because "each step down the path of one's career does not create a new and distinct relation with the employer for purposes of the Patterson test." Fray v. Omaha World Herald Co., 960 F.2d 1370, 1373 (8th Cir. 1992) (footnote omitted). "[Patterson] strongly suggests that, in addition to an increase in pay and duties, an actionable promotion claim must involve a meaningful, qualitative change in the contractual relationship." Sitgraves v. Allied-Signal, Inc., 953 F.2d 570, 573 (9th Cir. 1992) (noting as examples of actionable promotion claim moves from non-supervisory to supervisory position and from hourly to salaried compensation); see Rodriguez v. General Motors Corp., 27 F.3d 396, 399-400 (9th Cir. 1994) (holding essentially lateral change not actionable refusal to promote); Butts v. City of New York Department of Housing Preservation & Development, 990 F.2d 1397, 1411-12 (2d Cir. 1993) (Butts) (noting inquiry should not be confined to job titles but should examine actual changes in responsibility and status); cf. Winbush v. Iowa, 66 F.3d 1471, 1477 (8th Cir. 1995) (issue noted but not decided).

We agree with the district court that the promotion from leadman to foreman involved a sufficiently new and fundamentally different contractual relationship to

constitute an actionable promotion claim under § 1981. This was not the kind of promotion "understood by the parties to be given routinely upon satisfactory job performance." Butts, 990 F.2d at 1412. Nor was it the kind of promotion that involved merely "moving an employee from one position to another as part of a reallocation of personnel resources, not involving a substantial increase in status or responsibility." Id. The promotion involved a change from limited supervisory duties and limited authority over employees to additional supervisory duties and greater authority, from hourly to salaried compensation, and from non-management to management status, as

well as an increase in pay and a change of position in the chain of authority.  There were many leadman positions (six in the shipping department alone) but only four foreman positions, each in charge of one department in the warehouse, who reported directly to the superintendent. Unlike leadmen, foremen performed traditional supervisory functions like making work assignments, planning and the hiring, evaluation and discipline of employees.  The relatively modest difference in pay between the two positions and the supervisory nature of both positions did not outweigh the other factors.  The district court did not err in denying Nash Finch's motion for judgment as a matter of law on the 1990 promotion claim.

INTENTIONAL DISCRIMINATION

Nash Finch next argues Kim failed as a matter of law to make a submissible case that he was not promoted in 1990 and 1992 because of intentional discrimination on the basis of race, color or national origin.  This argument has two points.  First, Nash Finch argues instruction No. 12 incorrectly permitted the jury to find in favor of Kim if it found only that Nash Finch's asserted legitimate, nondiscriminatory reason for not promoting him was false. Nash Finch argues that the instruction failed to require the jury to find that the asserted reason was a pretext for intentional discrimination. Nash Finch also argues there was insufficient evidence of intentional discrimination, that is, that it failed to promote Kim because of race, color or national origin.  In sum, Nash Finch argues that Kim failed to show that its articulated legitimate, nondiscriminatory reason was false and that, even assuming it was false, such a finding alone cannot

support a finding of intentional discrimination.  Nash Finch's argument correctly states the applicable law; however, we hold the instruction was not erroneous and the evidence was sufficient to support the jury's verdict that Nash Finch intentionally discriminated against Kim.

The analysis applicable to Title VII disparate treatment and 42 U.S.C. § 1981 claims in employment cases is the familiar three-part framework initially set out in

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 800-06 (1973) (<u>McDonnell Douglas</u>), and further refined in Supreme Court cases, most recently <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993) (<u>Hicks</u>).  This court recently clarified the analysis in <u>Ryther v. KARE 11</u>, 108 F.3d 832, 836 (8th Cir.) (banc) (<u>Ryther</u>), <u>cert. denied</u>, 117 S.Ct. 2510 (1997).  The elements of a Title VII disparate treatment claim and a § 1981 claim are identical.  <u>Hicks</u>, 509 U.S. at 506 n.1 (noting <u>McDonnell Douglas</u> framework also applies to claims of purposeful employment discrimination on the basis of race under 42 U.S.C. § 1983).  First, the plaintiff must establish a prima facie case.  Second, if the plaintiff establishes a prima facie case, the defendant must "rebut the presumption of discrimination [raised by the prima facie case] by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason."  <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981) (<u>Burdine</u>) (noting the employer must only articulate legitimate, nondiscriminatory reason, but need not persuade the factfinder that it was actually motivated by the proffered reasons).  Third, if the defendant carries this burden, the plaintiff is entitled to the opportunity to show that the defendant's articulated reason was in fact "not the true reason for the employment decision" and a "pretext for discrimination."  <u>Id.</u> at 256; <u>see</u> <u>Hicks</u>, 509 U.S. at 216 & n.6 ("pretext for discrimination" means both that the proffered reason was false and that discrimination was the real reason).

"This burden [of demonstrating that the proffered reason was not the true reason for the employment

decision] now merges with the ultimate burden of persuading the [trier of fact] that [the plaintiff] has been the victim of intentional discrimination." Burdine, 450 U.S. at 256. The plaintiff can establish that he or she has been the victim of intentional discrimination "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id.

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination, and . . . , upon such rejection, "[n]o additional proof of discrimination is required."

Hicks, 509 U.S. at 511 (footnote omitted).

Thus, according to Hicks, when the plaintiff's evidence . . . challenges the defendant's articulated nondiscriminatory reason, such evidence may serve as well to support a reasonable inference that discrimination was a motivating reason for the employer's decision. As the Supreme Court has observed, "when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reasons, based [its] decision on an impermissible consideration such as [race]."

. . . .

In sum, when the employer produces a nondiscriminatory reason for its actions, the prima facie case no longer creates a legal presumption of unlawful discrimination. The elements of the prima facie case remain, however, and if they are accompanied by evidence [showing that the defendant's proffered explanation is false] and disbelief of the defendant's proffered explanation, they may permit the jury to find for the plaintiff. This

-21-

is not to say that, for the plaintiff to succeed, simply proving [that the defendant's proffered explanation is false] is necessarily enough. We emphasize that evidence [that the defendant's proffered explanation is false] will not be enough to make a submissible case if it is, standing alone, inconsistent with a reasonable inference of [unlawful] discrimination. [T]he plaintiff must still persuade the jury, from all the facts and circumstances, that the employment decision was based upon intentional discrimination.

Ryther, 108 F.3d at 836-38 (citation and footnotes omitted).  "Thus, Hicks makes it clear that the plaintiff must show 'both that the [proffered] reason was false, and that discrimination was the real reason.'"  Id. at 838 n.5, citing Hicks, 509 U.S. 515.  "It is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."  Hicks, 509 U.S. at 519.

Jury Instructions

We address the instruction issue first.  "[W]e review the district court's jury instructions for abuse of discretion and on review must determine simply 'whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.'"  Karcher v. Emerson Electric Co., 94 F.3d 502, 510 (8th Cir. 1996) (citing Sherbert v. Alcan Aluminum Corp., 66 F.3d 965, 968 (8th Cir. 1995)), cert. denied, 117 S. Ct. 1692, 1693 (1997).  "[W]e will not find error in instructions simply because they are technically imperfect or are not a model of clarity."  Hastings v. Boston Mutual Life Insurance Co., 975 F.2d 506, 510 (8th Cir. 1992).  We will reverse only if we find that "the jury instructions contained an error or errors that affected the substantial rights of the parties."  Id.

Instruction No. 12 provided in part that "[a] false or pretextual reason for the decision not to promote the plaintiff is one form of evidence from which you may, but are not required, to find that the defendant discriminated against the plaintiff."  Nash Finch argues that this part of instruction No. 12 improperly permitted the jury to

find in favor of Kim if it found only that Nash Finch's asserted legitimate, nondiscriminatory reason for not promoting him was false. We disagree because, when read as a whole, instruction No. 12 correctly set forth the applicable law. The paragraph immediately preceding the sentence to which Nash Finch objected provided that "you may find Defendant Nash Finch intentionally discriminated against Plaintiff Jin Kim if you reject the Defendant's stated reasons for not promoting him and you find Defendant's stated reasons for its decision not to promote Plaintiff were given to hide an intent by Nash

Finch to discriminate on the basis of his race, color or national origin." This part of instruction No. 12 correctly instructed the jury, as required by Hicks, that it had to find both that the stated reason was false and that intentional discrimination on the basis of race was the real reason in order to return a verdict in favor of Kim, not only that the stated reason was false. Ryther, 108 F.3d at 838 & n.5 (noting Hicks makes it clear that the plaintiff must show both that the reason was false and that intentional discrimination was the real reason). The instructions for the 1990 promotion claim (No. 9) and the ADEA claim (No. 14) similarly provided that the jury could find race or age was a determining factor if it found Nash Finch's stated reason for its decision was "not the true reason, but [was] a 'pretext' to hide discriminatory motivation." These instructions correctly premised liability on a finding of discrimination and not merely on a finding that Nash Finch's proffered reason was false.

Sufficiency of the evidence-- failure to promote

Next, we address the sufficiency of the evidence. Nash Finch argues that it is entitled to judgment as a matter of law because Kim failed to make a submissible case that racial discrimination motivated the decisions not to promote him. Nash Finch argues that there was evidence that its proffered reason was false but no evidence of racial discrimination. We disagree.

"[W]e will not reverse a jury's verdict for insufficient evidence unless, after viewing the evidence in the light most favorable to the verdict, we conclude that no reasonable juror could have returned a verdict for the non-moving party." Ryther, 108 F.3d at 836. Our role

-25-

on appeal is to determine whether there is an evidentiary basis for the jury's verdict. <u>Id.</u> at 844-45. "[W]hen that evidentiary basis becomes apparent, it [is] immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." <u>Lavender v. Kurn</u>, 327 U.S. 645, 653 (1946). "Whether an issue was properly before the jury, however, is a legal question which is

reviewed de novo." Kimzey v. Wal-Mart Stores, Inc., 107
F.3d 568, 573 (8th Cir. 1997) (citation omitted).

We have reviewed the evidence in the light most
favorable to Kim as the prevailing party, assumed that all
conflicts in the evidence were resolved in his favor,
assumed as proved all facts that his evidence tended to
prove, and given him the benefit of all reasonable
inferences that may reasonably be drawn from the facts
proved.  We hold the record as a whole-- specifically, the
combination of the undisputed evidence as to the elements
of the prima facie case and the strong evidence that Nash
Finch's proffered reason was false, which, when considered
with the strong evidence of retaliation-- clearly provided
sufficient evidence as a matter of law to allow the jury
to find Nash Finch intentionally discriminated against Kim
on the basis of race in failing to promote him.  This
reasonable inference is the logical result of the
application to the evidence of the McDonnell Douglas
analytical framework for the allocation of the burden of
production and the order for the presentation of proof.

It was not disputed that Kim established a prima facie
case:  (1) Kim was a member of a racial minority, (2) he
was qualified for promotion, (3) he was not promoted, and
(4) Nash Finch promoted a non-minority.  The prima facie
case created a legal presumption of unlawful
discrimination.  Because Nash Finch articulated
nondiscriminatory reasons for promoting someone else, the
legal presumption of unlawful discrimination, created by
the prima facie case, then dropped out of the case.
However, the elements of the prima facie case remained in
the case.  The evidence refuted Nash Finch's articulated
nondiscriminatory reasons and strongly suggested that Nash

Finch had lied about those reasons.  Nash Finch conceded at trial that Kim was qualified for promotion but argued the successful candidates were better qualified.  There was evidence that Kim was relatively better qualified for promotion in terms of education, seniority and supervisory experience than the successful candidates.  There was also evidence from which the jury could conclude that Nash Finch's managers were not particularly credible.  Mund initially told Kim that the 1990 promotion had

been made at a higher level even though Mund had made the decision himself. Mund then told Kim that he had not been promoted because he was not qualified. However, Mund testified at trial that he never seriously considered Kim for promotion because Kim lacked personal loyalty to him (Mund).

The evidence challenged Nash Finch's articulated nondiscriminatory reasons for not promoting Kim and supported a reasonable inference that unlawful discrimination was a motivating reason for Nash Finch's failure to promote Kim. This evidence was sufficient to permit the jury to infer the ultimate fact of intentional discrimination. Hicks, 509 U.S. at 511; Ryther, 108 F.3d at 836-37. This is because "when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reasons, based [its] decision on an impermissible consideration such as race." Furnco Construction Co. v. Waters, 438 U.S. 567, 577 (1978). This is not a case in which the evidence showing the employer's proffered reason was false was inconsistent with a reasonable inference of unlawful discrimination. Here, Nash Finch contended the real reason Kim was not promoted was that the successful candidates were better qualified. Kim's evidence showed that the proffered reason was false; it did not show that some reason other than unlawful discrimination was the real reason he was not promoted. See Ryther, 108 F.3d at 837 n.4 (discussing cases in which evidence showing employer's proffered reason was false was inconsistent with reasonable inference of unlawful discrimination and citing Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1337 (8th Cir.

1996) (evidence showed real reason for discharge was confrontation about SEC violations), <u>Barber v. American Airlines, Inc.</u>, 791 F.2d 658, 660 (8th Cir.) (evidence showed real reason for disparate treatment was not age discrimination), <u>cert. denied</u>, 479 U.S. 885 (1986), and <u>Visser v. Packer Engineering Assocs.</u>, 924 F.2d 655, 657 (7th Cir. 1991) (banc) (explaining "pretext" in employment law means a reason that employer offers for action claimed to be discriminatory and that factfinder disbelieves, allowing inference that employer is trying to conceal a discriminatory reason and not some other unethical

reason or even a mask for such a reason; evidence showed that plaintiff was fired because he was disloyal to CEO; thus real, albeit unethical, reason for firing was not age discrimination but plaintiff's loyalty to company rather than to CEO personally)).

In addition to the elements of the prima facie case and the evidence showing Nash Finch's proffered reason was false, there was also evidence that, out of more than 3,500 employees, only 2 management employees in 25 years were non-white. Those employees were not warehouse supervisory employees; they were assistant retail grocery store managers. There was also evidence that the only Asian-American employee at the Cedar Rapids warehouse other than Kim was employed as a janitor. There was also some evidence that Nash Finch disciplined Kim more severely than non-Asian employees for comparable incidents and that the disciplinary action was in retaliation for his filing discrimination charges. As noted above, direct evidence of intentional discrimination was not required; case law recognizes that intentional discrimination may be proven by circumstantial evidence because "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 714 n.3 (1983). "After all, the McDonnell Douglas framework exists to provide discrimination plaintiffs a way to prove their case when they do not have 'explicit, inculpatory evidence of discriminatory intent.'" Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996), citing Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 776 (8th Cir. 1995).

In sum, the record as a whole in this case-- the evidence showing that Nash Finch's proffered reason was false, plus the evidence establishing the elements of the

prima facie case-- was sufficient to permit the jury reasonably to find that Nash Finch intentionally discriminated against Kim on the basis of race in refusing to promote him to shipping foreman in November 1990 and in April 1992.  Consistent with <u>Hicks</u>, no additional evidence of discrimination was required.  The evidence in this case presented inconsistent inferences to the jury, and the resolution of this conflicting evidence was a matter for the jury to resolve.  <u>E.g.</u>, <u>Ryther</u>, 108 F.3d at 845 (citing cases).  The

district court did not err in denying Nash Finch's motion for judgment as a matter of law on the discrimination claims.

RETALIATION

Nash Finch next argues Kim failed to make a submissible retaliation claim. Nash Finch argues that, as a matter of law, Kim suffered no adverse employment action because he was not demoted, terminated, reassigned, or suspended, did not lose any compensation or privileges, and in fact is still employed by Nash Finch. Nash Finch also argues that, assuming there was an adverse employment action, there was no evidence of a causal relationship between to Kim's filing a race discrimination charge and any adverse employment action. Nash Finch also argues that any adverse employment action was justified under the circumstances.

Like the substantive claim of racial discrimination, a claim of retaliation, in a racial discrimination context, can violate both Title VII and 42 U.S.C. § 1981. Setser v. Novack Investment Co., 638 F.2d 1137, 1146-47 (8th Cir. 1981) (Setser) (subsequent history omitted) (holding retaliation by employer against plaintiff for filing race-based EEOC complaint would be based on racial discrimination for purposes of 42 U.S.C. § 1981 claim); see also Greenwood v. Ross, 778 F.2d 448, 455-56 (8th Cir. 1985); Sisco v. J.S. Alberici Construction Co., 655 F.2d 146, 150 (8th Cir. 1981) (applying Setser), cert. denied, 455 U.S. 976 (1982). We apply the same McDonnell Douglas analytical framework to a retaliation claim under § 1981 and Title VII. See, e.g., Evans v. Kansas City, Missouri, School District, 65 F.3d 98, 101 (8th Cir. 1995) (§ 1981

retaliation claim), <u>cert. denied</u>, 116 S. Ct. 1319 (1996); <u>Kobrin v. University of Minnesota</u>, 34 F.3d 698, 704 (8th Cir. 1994) (Title VII retaliation claim) (<u>Kobrin</u>).  The elements of a retaliation claim under § 1981 and Title VII are (1) protected activity, (2) subsequent adverse employment action, and (3) a causal relationship between the two.  <u>See</u> <u>Barge v. Anheuser-Busch, Inc.</u>, 87 F.3d 256, 259 (8th Cir. 1996) (§ 1981 retaliation claim); <u>Kobrin</u>, 34 F.3d at 704 (Title VII retaliation claim).

<u>Adverse employment action</u>

Nash Finch argues that the district court erred in denying its motion for judgment as a matter of law because Kim failed to show any adverse employment action. Nash Finch argues Kim was not demoted, terminated, reassigned, or suspended, did not lose any compensation or privileges, and in fact is still employed by Nash Finch. We hold Nash Finch's actions did rise to the level of adverse employment action.

Typically, it is obvious whether an employer took adverse employment action when, for example, the employee has been terminated or discharged. However, retaliatory conduct may consist of "action less severe than outright discharge." <u>Dortz v. City of New York</u>, 904 F. Supp. 127, 156 (S.D.N.Y. 1995) (allegations that employer's actions disadvantaged and interfered with employee's ability to perform her job). What happened to Kim was much "'more disruptive than a mere inconvenience or an alteration of job responsibilities' [or] [c]hanges in duties or working conditions that cause no materially significant disadvantage." <u>Harlston v. McDonnell Douglas Corp.</u>, 37 F.3d 379, 382 (8th Cir. 1994) (citation omitted) (no adverse employment action where plaintiff was reassigned without diminution in title, salary or benefits); <u>see</u> <u>Thomas v. St. Luke's Health Systems, Inc.</u>, 869 F. Supp. 1413, 1435 (S.D. Iowa 1994) (holding employer's initial demands that employee take drug test, which was subsequently withdrawn, and accept another position had no impact on continued employment and did not rise to level of adverse employment action), <u>aff'd</u>, 61 F.3d 908 (8th Cir. 1995) (table) (No. 94-4081). Kim's duties had been reduced; he received much lower performance evaluations

than he had received before filing his employment discrimination charge; he was required to undergo special remedial training. There was also evidence that Nash Finch had "papered" his personnel file with negative reports, including two written reprimands. These are the kind of serious employment consequences that adversely affected or undermined Kim's position, even if he was not discharged, demoted or suspended.

In any event, we need not decide in the present case whether each act in itself constituted actionable "adverse employment action" because Kim essentially claimed that Nash Finch had systematically retaliated against him, that is, that all the acts were taken in response to his filing the employment discrimination charge and were thus connected to one another. Cf. Caliendo v. Bentsen, 881 F. Supp. 44, 48 (D.D.C. 1995) (alleging personnel actions such as removal from undercover operation, failure to receive monetary award, removal as acting group supervisor, receipt of letter of reprimand, etc. constituted series of adverse employment actions in retaliation for EEOC activities). We hold that, as a matter of law, Nash Finch's conduct, which included reduction of duties, disciplinary action and negative personnel reports, as well as required remedial training, constituted adverse employment action.

Sufficiency of the evidence

Nash Finch also argues that the district court erred in denying its motion for judgment as a matter of law because there was no evidence of a causal connection between Kim's filing a race discrimination charge and any adverse employment action and that any adverse employment action was justified under the circumstances. We have reviewed the evidence in the light most favorable to Kim as the prevailing party, assumed that all conflicts in the evidence were resolved in his favor, assumed as proved all facts that his evidence tended to prove, and given him the benefit of all reasonable inferences that may reasonably be drawn from the facts proved. We hold the record as a whole-- specifically, the elements of the prima facie case and the evidence showing that Nash Finch's proffered

reason was false-- provided a sufficient basis from which reasonable jurors could find that Nash Finch retaliated against Kim for filing an employment discrimination charge.  This permissible inference is the logical result of the application to the evidence of the McDonnell Douglas analytical framework for the allocation of the burden of production and the order for the presentation of proof.

Filing an employment discrimination charge is activity protected by Title VII, §704(a), 42 U.S.C. § 2000e–3(a). Nash Finch knew in May 1992 that Kim had filed an employment discrimination charge.  In fact, Nash Finch justified disclosure of Kim's personnel file, which contained a report of a disciplinary action based on a race-related incident, as part of its response to the local civil rights commission investigation.  Kim had received high performance evaluations and had had no disciplinary problems.  However, after Kim filed the employment discrimination charge, his Saturday and fill-in shipping foreman duties were immediately eliminated, he began to receive markedly lower performance evaluations, he was orally cautioned about a poor attitude toward management, he was placed under surveillance and excluded from meetings at work, he was disciplined following a September 1992 incident in which Nash Finch found Kim had made racial slurs against a co-worker, and in late 1993 he was required to participate in special remedial training. This circumstantial evidence-- that the employer was aware of the protected activity and that adverse employment action "followed the protected activity so closely in time as to justify an inference of retaliatory motive"-- was sufficient to establish the requisite causal connection between the protected activity and the adverse employment action.  Rath v. Selection Research, Inc., 978 F.2d 1087, 1090 (8th Cir. 1992); see Kobrin, 34 F.3d at 704; cf. Barge v. Anheuser-Busch, Inc., 87 F.3d at 259-60 (holding plaintiff failed to make prima facie case of retaliation because she produced no evidence connecting her prior EEOC claim to alleged harassment, denial of assistance with job-related tasks, or denial of disability benefits).

Nash Finch defended its post-May 1992 actions as a legitimate, continuing "dialogue" between an employee and management about adherence to company work rules and respect for company equal employment opportunity policies. However, Kim produced evidence that refuted the negative reports in his personnel file, including evidence that Nash Finch had "papered" his personnel file with negative reports. Some of the negative reports involved petty and insignificant incidents; however, some of the negative reports supported Nash Finch's claim that Kim lacked management ability and

had refused opportunities for additional supervisory responsibility. More seriously, as noted above, there was evidence that the initial reports about the September 1992 incident did not include any reference to racial discrimination. However, in November 1992, after Kim had requested a right-to-sue letter, senior management issued a written reprimand to Kim about the September 1992 incident. This written reprimand specifically described the racial context of the incident and stated that the company would not tolerate discrimination which would be in violation of Title VII and that Kim's actions had probably violated his co-worker's civil rights. The jury could have reasonably found that Nash Finch placed the written reprimand in Kim's personnel file in order to discredit Kim when the local civil rights commission was investigating his employment discrimination charge. There was also evidence that Nash Finch did not handle in the same way a similar dispute about work assignments involving the same co-worker and another foreman and a complaint about sexual harassment by another employee. Unlike the incident involving Kim, these incidents did not result in written reprimands.

In sum, we hold the evidence as a whole-- evidence that the employer's proffered reasons were false, as well as the evidence establishing the elements of the prima facie case-- was sufficient to permit the jury to find the ultimate fact of retaliation. Consistent with Hicks, no additional evidence of retaliation was required. The evidence in this case presented inconsistent inferences to the jury, and the resolution of this conflicting evidence was a matter for the jury to resolve. The district court did not err in denying Nash Finch's motion for judgment as a matter of law on the retaliation claim.

AMENDMENT OF PLEADINGS

This is Kim's principal contention on appeal. Kim argues the district court abused its discretion in denying his motion to amend his pleadings to conform to the evidence under Fed. R. Civ. P. 15(b) by adding 42 U.S.C. § 1981 as a theory for recovery for the 1992 promotion and retaliation claims. Nash Finch, however, characterizes this issue as an instruction issue and argues the instructions and the special verdict forms submitted the 1992 promotion and retaliation claims to the jury under Title VII only. Nash Finch argues the district court correctly concluded that Kim's failure to object to the instructions or the special verdict forms under Fed. R. Civ. P. 51 waived any argument that those claims should have been submitted to the jury under § 1981 as well as Title VII.

Whether the 1992 promotion and retaliation claims should have been (or actually were) submitted to the jury under § 1981 as well as Title VII is critical because compensatory and punitive damages are "capped" under Title VII but not under §1981. Thus, under Title VII, Kim's compensatory and punitive damages would be limited to $300,000, but the amount of damages could be much greater under § 1981. (The jury awarded Kim a total of $8,650,000 for compensatory and punitive damages for the 1992 promotion and retaliation claims.) This is because 42 U.S.C. § 1981a(b)(3)-- the statutory cap-- limits the amount of any award of compensatory and punitive damages for Title VII claims for intentional discrimination. Cf. Kimzey v. Wal-Mart Stores, Inc., 107 F.3d at 575-76 (applying statutory cap to Title VII claims but not to state anti-discriminatory claims); Luciano v. Olsten

<u>Corp.</u>, 912 F. Supp. 663, 675 (E.D.N.Y. 1996) (same), <u>aff'd</u>, 110 F.3d 210 (2d Cir. 1997).[4]  However, the Title VII statutory cap does not apply to § 1981 claims; the 1991 Civil Rights Act, which made

---

[4]The Iowa civil rights statute does allow for compensatory damages but not punitive damages.  <u>E.g.</u>, <u>Chauffeurs Local Union No. 238 v. Iowa Civil Rights Comm'n</u>, 394 N.W.2d 375, 382-84 (Iowa 1986).

compensatory and punitive damages available under Title VII, specifically provides that "[n]othing in this section shall be construed to limit the scope of, or the relief available under, section 1981 of this title."  42 U.S.C. § 1981a(b)(4); see Johnson v. Metropolitan Sewer District, 926 F. Supp. 874, 876 (E.D. Mo. 1996), citing West v. Boeing Co., 851 F. Supp. 395, 399-01 & nn.4, 5 & 7 (D. Kan. 1994) (reviewing legislative history of § 1981a(a)(1) as expanding remedies available under Title VII for intentional discrimination); cf. Reynolds v. Octel Communications Corp., 924 F. Supp. 743, 747 (N.D. Tex. 1995) (holding recovery of both liquidated damages under ADEA and punitive damages under Title VII would be double recovery for same conduct); Bradshaw v. University of Maine System, 870 F. Supp. 406, 407-08 (D. Me. 1994) (holding plaintiff who could have but did not plead race discrimination claim under §1981 was not barred from bringing Title VII race discrimination claim for compensatory and punitive damages by § 1981a).

     As a threshold matter, we do not agree that Kim waived this argument by failing to object to the instructions or the special verdict forms.  The focus of Kim's argument is not on the jury instructions or the special verdict forms themselves (indeed, Kim argues he had no grounds to object to the jury instructions or the special verdict forms because they correctly stated the applicable law), but on the denial of his motion to amend the pleadings to conform to the evidence.  Cf. City of St. Louis v. Praprotnik, 485 U.S. 112, 119-20 (1988) (holding failure to timely object to jury instructions was no obstacle to appellate review of same legal issue raised in motions for summary judgment and directed verdict).  Motions to amend the pleadings to conform to the evidence under Rule 15(b) can be made at

any time, even after judgment.  If the issue of § 1981 liability was tried by implied consent, the district court should have considered it raised by the pleadings and should have allowed amendment upon Kim's request.

> Amendments are allowed when the parties have had actual notice of an unpleaded issue and have been given an adequate opportunity to

cure any surprise resulting from the change in
the pleadings.  And, when evidence relating to
issues outside the pleadings is introduced and
tried without objection, the parties will be
deemed to have acquiesced.

Nielson v. Armstrong Rubber Co., 570 F.2d 272, 275 (8th
Cir. 1978) (citations omitted).

An amended complaint that "merely amplifies some
of the allegations that have been proven" should
be allowed.  On the other hand, however, a
district court is not required to grant a motion
to amend on the basis of some evidence that
would be relevant to the new claim if the same
evidence was also relevant to a claim originally
pled.  The introduction of such evidence does
"not provide the defendant any notice" that the
implied claim was being tried.

Gamma-10 Plastics, Inc. v. American President Lines,
Ltd., 32 F.3d 1244, 1256 (8th Cir. 1994) (citations
omitted), cert. denied, 513 U.S. 1198 (1995).

In the present case, the same evidence relevant to the
new theory of recovery-- § 1981-- was relevant to the
theory of recovery originally pled-- Title VII.  This is
because, as discussed above, Title VII and § 1981 set
forth parallel, substantially identical, legal theories of
recovery in cases alleging intentional discrimination in
employment on the basis of race.  This is particularly so
after the enactment of the 1991 Civil Rights Act.  Before
1991, compensatory and punitive damages were available
under § 1981 but not under Title VII.  Among other things,
the 1991 Civil Rights Act expanded the definition of "make
and enforce contracts" in § 1981 to include the terms and

-46-

conditions of employment, including discharge, added the right to jury trial to Title VII, and, most importantly, expanded the remedies available to Title VII plaintiffs to include compensatory damages (for emotional pain, suffering, mental anguish, etc.) and punitive damages. Compensatory and punitive damages are only available under Title VII if the plaintiff cannot recover under § 1981. 42 U.S.C. § 1981a(a)(1). The

elements of claims alleging disparate treatment on the basis of race under Title VII and intentional employment discrimination on the basis of race under § 1981 are identical. <u>Hicks</u>, 509 U.S. at 506 n.1. The standard for punitive damages is the same under Title VII, 42 U.S.C. § 1981a(b)(1) (malice or reckless indifference to federally protected rights), and § 1981. <u>E.g.</u>, <u>Kolstad v. American Dental Ass'n</u>, 323 U.S. App. D.C. 402, 108 F.3d 1431, 1437 (1997) (holding standard of proof for punitive damages under 42 U.S.C. § 1981a is the same as that previously established for punitive damages under 42 U.S.C. §§ 1981 and 1983), <u>citing</u> <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983) (§ 1983), <u>and</u> <u>Williamson v. Handy Button Machine Co.</u>, 817 F.2d 1290, 1296 (7th Cir. 1987) (§ 1981). The elements of a retaliation claim under § 1981 and Title VII are the same as well. <u>See</u> <u>Barge v. Anheuser-Busch, Inc.</u>, 87 F.3d at 259 (§ 1981 retaliation claim); <u>Kobrin</u>, 34 F.3d at 704 (Title VII retaliation claim). However, there are still differences between the two statutes. They are not co-extensive in coverage (for example, Title VII does not cover all employers). Title VII requires exhaustion of administrative remedies, and the statutes of limitations are different. Most importantly, the amount of compensatory and punitive damages is limited under Title VII but not under § 1981.

"We have held that the admission of evidence bearing on a pleaded issue cannot form the basis for an amendment under Rule 15(b) unless the defendant knew of the plaintiff's intent to inject the unpleaded issues." <u>McLaurin v. Prater</u>, 30 F.3d 982, 986 (8th Cir. 1994). In the present case there is no doubt that Kim intended the evidence to support § 1981 in addition to Title VII because the complaint itself alleged that Nash Finch's

conduct had violated both Title VII and § 1981 (as well as the ADEA and state law). Counts I and II, the failure-to-promote counts, are broadly stated, but the parties and the district court treated count I as alleging the April 1992 failure-to-promote violated Title VII (as well as the ADEA and state law) and count II as alleging the November 1990 failure-to-promote violated § 1981. Count III alleged Nash Finch retaliated against Kim for filing an administrative charge. The caption and text of Count I referred to Title VII; the caption and text of Count II referred to § 1981 expressly and to Title VII by incorporation (the first paragraph of count II "repleaded"

the paragraphs of count I; recovery under Title VII for the November 1990 failure-to-promote was precluded because Kim did not file his administrative charge within 300 days; the complaint was timely filed (within 2 years) for purposes of §1981). The caption and text of count III alleged retaliation in violation of only Title VII expressly, but, like count II, also incorporated the previous paragraphs, including the reference therein to § 1981. The allegations in the complaint were sufficient to put Nash Finch on notice of Kim's claim that Nash Finch's conduct violated both Title VII and § 1981, certainly so that Nash Finch cannot claim surprise.

In addition, Kim moved several times to amend the pleadings, in pre-trial proceedings (opposing Nash Finch's motion for summary judgment), immediately before trial began and then during the trial. Each time Kim explained why he sought to amend the pleadings to add § 1981 as a theory for recovery for the April 1992 failure-to-promote and retaliation claims, specifically referring to the statutory cap on damages under Title VII but not under § 1981. Moreover, on the third day of trial, near the close of the evidence, in ruling on Kim's renewed motion, the district court found that the case had been tried on the basis of both § 1981 and Title VII and granted the motion to amend the pleadings to add § 1981 as a theory of recovery. It was only after the case had been submitted to the jury (following an extensive instructions conference during which, among other issues, the standard of proof for punitive damages under Title VII and § 1981 was discussed) that the district court reconsidered and then denied the motion to amend the pleadings. It would seem that if any party was surprised by this turn of events, it was Kim.

We think the record shows that, even though § 1981 as a theory of recovery was not pleaded, it was fairly tried by the parties. Moreover, because of the substantial identity of Title VII and § 1981 as theories of recovery for claims of intentional discrimination, Nash Finch was not prejudiced by the amendment because it had a fair opportunity to defend § 1981 as a theory of recovery. We are satisfied that, given the substantial identity of Title VII and § 1981 as theories of recovery, the jury's finding

of intentional discrimination under Title VII also constituted a finding of intentional discrimination under § 1981, even though the instructions for the April 1992 promotion and retaliation claims (as well as the punitive damages instruction) did not refer to §1981.  Thus, we hold the district court abused its discretion in denying the motion to amend the pleadings to conform to the evidence.  See, e.g., Gamma-10 Plastics, Inc. v. American President Lines, Ltd., 32 F.3d at 1255-57 (holding abuse of discretion to deny motion to amend complaint to add claim for punitive damages under general maritime law); McLaurin v. Prater, 30 F.3d at 985-86 (suggesting on remand that district court should grant motion to amend complaint to add state law claims to constitutional claim based on same facts); Corsica Livestock Sales, Inc. v. Sumitomo Bank, 726 F.2d 374, 377-78 (8th Cir. 1983) (holding abuse of discretion to deny motion to amend complaint to add contract theory of recovery to rule violation theory of recovery alleged in complaint); Nielson v. Armstrong Rubber Co., 570 F.2d at 275-76 (holding abuse of discretion to deny motion to amend complaint to add strict products liability claim to negligence claim already alleged); cf. Oglala Sioux Tribe v. Andrus, 603 F.2d 707, 714 (8th Cir. 1979) (noting federal rules abolished "theory of the pleadings" doctrine under which plaintiff must succeed on those theories that are pleaded or not at all).

Because § 1981 was a basis for recovery, the Title VII cap on compensatory and punitive damages does not apply. We turn next to Nash Finch's damages arguments.
COMPENSATORY DAMAGES

Nash Finch argues there was no evidence to support the award of $21,000 in back pay (lost wages). Nash Finch argues that the difference in pay between what Kim was paid as a leadman and what he would have been paid had he been promoted to foreman was at most $1932.81. Nash Finch bases this calculation on the salaries paid to the two employees who were promoted to the position of shipping foreman in 1990 and 1992. We hold there was evidence to support the award of $21, 000 in back pay.

Kim presented evidence showing that the salaries of comparable employees and evidence that there was no set pay scale for the position, that Nash Finch considered a number of facts in setting salaries, and that he had more seniority and more experience in the shipping department (including experience as the Saturday shipping foreman) than the two individuals who were promoted in 1990 and 1992.

Nash Finch also argues there was no evidence to support the award of $447 per month in front pay. Nash Finch argues that at most the difference in pay was about $360 per month. Nash Finch bases this calculation on the higher of the salaries paid to the two employees who were promoted to the position of shipping foreman in 1990 and 1992. (The lower difference in salary was about $240 per month.) The district court based the amount of the front pay award on the back pay award ($21,000 over 47 months (from November 1990 promotion to September 1994 verdict), or $447 per month). Slip op. at 16-19, 21. We have already held that the district court's calculation of back pay is supported by substantial evidence, and we cannot disapprove of the calculation of front pay based on the same evidence.

Nash Finch also argues there was no medical or other expert testimony to support the finding of emotional distress. The jury awarded Kim $ 100,000 for mental anguish and loss of enjoyment of life caused by the November 1990 failure-to-promote under 42 U.S.C. § 1981. Medical or other expert evidence is not required to prove emotional distress. Turic v. Holland Hospitality, Inc., 85 F.3d 1211, 1215 (6th Cir. 1996) (Title VII). "A plaintiff's own testimony, along with the circumstances

of a particular case, can suffice to sustain the plaintiff's burden in this regard." <u>Id.</u> at 1215-16 (citing cases); <u>see, e.g.</u>, <u>Wilmington v. J.I. Case Co.</u>, 793 F.2d 909, 922 (8th Cir. 1986) (42 U.S.C. § 1981) (testimony of plaintiff and other witnesses about plaintiff's deterioration in health, mental anxiety, humiliation, and emotional distress resulting from working conditions and discharge); <u>Williams v. Trans World Airlines, Inc.</u>, 660 F.2d 1267, 1272-73 (8th Cir. 1981) (testimony of plaintiff about humiliation or mental distress); <u>cf.</u> <u>Mardell v. Harleysville Life Insurance Co.</u>, 31 F.3d 1221,

1232-33 (3d Cir. 1994) (violation of employee rights frequently results in significant injury to dignity and demoralizing impairment of self-esteem) (citing cases), vacated on other grounds, 514 U.S. 1034 (1995); Rush v. Scott Specialty Gases, Inc., 930 F. Supp. 194, 199 (E.D. Pa. 1996) (testimony of plaintiff corroborated by friends, family and expert witnesses, plus evidence of physical suffering and need for professional care), rev'd on other grounds, 113 F.3d 476 (3d Cir. 1997). Here, Kim, his wife and his son testified about the anxiety, sleeplessness, stress, depression, high blood pressure, headaches, and humiliation he suffered after he was not promoted and after he filed the employment discrimination charge. We hold that medical or other expert evidence was not required to prove emotional distress and that there was sufficient evidence of emotional distress.

PUNITIVE DAMAGES

Nash Finch argues the district court erred in submitting the issue of punitive damages to the jury. Nash Finch argues the district court should have applied a heightened standard of proof for punitive damages because the 1991 Civil Rights Act, 42 U.S.C. § 1981a(b)(1), limits the availability of punitive damages to "exceptional circumstances of unusual bad motive that transcends ordinary intentional misconduct." Brief for Appellee/ Cross-Appellant at 46.

Under 42 U.S.C. § 1981a(b)(1) a complaining party may recover punitive damages if the defendant discriminates "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." We do not agree that the 1991 Civil Rights Act, 42 U.S.C.

§ 1981a(b)(1), limits the availability of punitive damages to "exceptional circumstances of unusual bad motive that transcends ordinary intentional misconduct." The Second Circuit rejected a similar argument in <u>Luciano v. Olsten Corp.</u>, 110 F.3d at 219-20. In that case the employer argued punitive damages required "extraordinarily egregious" conduct. The court held that "[n]othing in the . . . text [of § 1981a(b)(1)] indicates that a heightened standard was meant to

apply to Title VII cases." <u>Id.</u> at 220, <u>citing</u> <u>Rowlett v. Anheuser-Busch, Inc.</u>, 832 F.2d 194, 205 (1st Cir. 1987) (punitive damages under 42 U.S.C. § 1981 available where defendant's conduct is motivated by evil motive or involves reckless indifference to federally protected rights), <u>Beauford v. Sisters of Mercy-Province of Detroit, Inc.</u>, 816 F.2d 1104, 1108-09 (6th Cir.) (same), <u>cert. denied</u>, 484 U.S. 913 (1987), <u>and</u> <u>Smith v. Wade</u>, 461 U.S. at 55-56 (punitive damages under 42 U.S.C. § 1983 available under common law when conduct motivated by evil motive or intent or reckless or callous indifference to federally protected rights of others); <u>accord</u> <u>Kolstad v. American Dental Ass'n</u>, 108 F.3d at 1437-39. The court also noted the legislative history indicated that Congress intended to make punitive damages available under § 1981a "to the same extent and under the same standards that they are available to plaintiffs under 42 U.S.C. § 1981." 110 F.3d at 220, <u>citing</u> 137 Cong. Rec. H9527 (1991) (statement of Rep. Edwards), <u>and</u> H.R. Rep. No. 40(II), 102d Cong., 1st Sess. 24 (1991), <u>reprinted in</u> 1991 U.S.C.C.A.N. 717.

For this reason, we hold the district court correctly rejected Nash Finch's argument that a plaintiff must demonstrate something more than that required by the statute to recover punitive damages, that is, that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).[5]

---

[5]We need not decide whether recovery of punitive damages under Title VII requires a "heightened" showing beyond intentional discrimination (that is, intentional discrimination based on disparate treatment as opposed to disparate impact), although the author would suggest that it does not. <u>See</u> 42 U.S.C. § 1981a(d)(2) (defining

-58-

Nash Finch also argues that there was insufficient evidence to support the punitive damages award. Nash Finch argues there was no evidence of willfulness, malice or reckless indifference to the federally protected rights of others, much less "exceptional circumstances of unusual bad motive that transcends ordinary intentional misconduct." Nash Finch argues that, at most, there was only circumstantial evidence of discrimination consisting of "inconsistent explanations for the allocation of scarce employment opportunity." We hold that there was sufficient evidence to support the punitive damages award.

Based on the record as discussed above, a reasonable jury could have found that Nash Finch acted with reckless indifference to Kim's federally protected rights. There was evidence that Nash Finch knew what constituted unlawful employment practices. There was also evidence that Nash Finch systematically retaliated against Kim for filing an employment discrimination charge and attempted to discredit him by "papering" his personnel file. The intentional discrimination at issue-- failure to promote

---

"discriminatory practice" to mean disparate treatment and not disparate impact); cf. Rowlett v. Anheuser-Busch, Inc., 832 F.2d 194, 205-06 (1st Cir. 1987) (rejecting in pre-1991 Civil Rights Act case argument that punitive damages under § 1981 requires "aggravating circumstances" or "extraordinary or outrageous" misconduct, noting that it cannot really be disputed that intentional discrimination on basis of race is "worthy of some outrage"). But see Varner v. National Super Mkts, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996) (citing with approval Pandazides v. Virginia Bd. of Educ., 13 F.3d 823, 830 n.9 (4th Cir. 1994) (construing "heightened" showing necessary to recover punitive damages under §1981a(b)(1)), cert. denied, 117 S. Ct. 946 (1997); Karcher v. Emerson Elec. Co., 94 F.3d 502, 509 (8th Cir. 1996) (same), cert. denied, 117 S. Ct. 1692, 1693 (1997).

and retaliation-- involved disparate treatment, not disparate impact, and was undertaken by supervisors or management. "The requisite level of recklessness or outrageousness [required to support punitive damages] can be inferred from management's participation in the discriminatory conduct." Kimzey v. Wal-Mart Stores, Inc., 107 F.3d at 575, citing Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1062 (8th Cir. 1993). Direct evidence of intentional discrimination is not required; circumstantial evidence may be sufficient. United States Postal Service Board of Governors v. Aikens, 460 U.S. at 714 n.3. Finally, the record contained more than merely evidence of inconsistent explanations for Nash Finch's conduct, that is, that Nash Finch had lied;

as discussed above (at some length), there was also evidence that Nash Finch had intentionally discriminated against Kim on the bases of race or national origin.

EXCESSIVE VERDICT

Finally, Nash Finch argues the verdict was unreasonable because it was grossly excessive and grossly disproportionate to the kind of wrong and the actual damages. Nash Finch argues that the jury awarded $36,000 for back pay even though the difference in actual wages was less than $2,000, more than $1.5 million for emotional distress even though Kim continued to work and lead a normal life, and $7 million for punitive damages, an amount which is 3,500 times the actual loss of $2,000 and almost half of Nash Finch's annual earnings. Brief for Appellee/ Cross-appellant at 48; Reply Brief for Appellee/ Cross-appellant at 21 (citing Plaintiff's Ex. 26 at 2).

Because the district court applied the Title VII statutory cap, the district court limited the jury's award of $150,000 in compensatory damages for emotional distress for the 1992 failure-to-promote claim, the $1.5 million in compensatory damages for emotional distress for the retaliation claim, and the $7 million in punitive damages to a total of $ 300,000, slip op. at 15-16, and did not "engage in an analysis as to the excessiveness of the award except to say that damages in the amount being awarded are certainly not excessive due to the length of time the discrimination continued, the level of retaliation by Nash Finch and the financial well-being of Nash Finch." Id. at 14. Thus, as reduced by the district court, the judgment awarded Kim damages in the amount of $21,000 for lost wages, $100,000 for emotional distress

for the 1990 failure-to-promote claim and $300,000, including punitive damages, for the 1992 failure-to-promote and retaliation claims.  <u>Id.</u> at 27.

As discussed above, because the district court abused its discretion in denying the Rule 15(b) motion to amend, 42 U.S.C. § 1981 was a basis of recovery for the 1992 failure-to-promote and retaliation claims.  Because the Title VII statutory cap does not

apply to limit the recovery under 42 U.S.C. § 1981, the district court should not have reduced the amount of damages awarded pursuant to the Title VII statutory cap. See 42 U.S.C. § 1981a(b)(4); Johnson v. Metropolitan Sewer District, 926 F. Supp. at 876. Nonetheless, we think the district court was correct to reduce the amount of damages awarded by the jury because the amount was grossly excessive. In effect, what the district court did amounted to remittitur, which we review for clear abuse of discretion. See, e.g., Kientzy v. McDonnell Douglas Corp., 990 F.2d at 1062. It is not possible to ascertain what portion of the $300,000 is attributable to compensatory or punitive damages, so we will assume for purposes of analysis that the entire amount was for punitive damages.

After carefully reviewing the evidence, we conclude that, although an award of $1.75 million for emotional distress is grossly excessive, an award of $100,000 is not. See Kimzey v. Wal-Mart Stores, Inc., 107 F.3d at 570 ($35,000); Turic v. Holland Hospitality, Inc., 85 F.3d at 1215-16 (listing cases in which damages for emotional distress ranged from $40,000 to $150,000); Kientzy v. McDonnell Douglas Corp., 990 F.2d at 1054 ($150,000); Rush v. Scott Specialty Gases, Inc., 930 F. Supp. at 199 ($100,000).

Similarly, we conclude that, although an award of $7 million for punitive damages is grossly excessive, an award of $300,000 is not. Factors to consider in determining the reasonableness of a punitive damages award include the degree of reprehensibility of the defendant's conduct, the ratio or relationship between the actual harm inflicted on the plaintiff and the punitive damages award,

and civil penalties authorized or imposed for comparable misconduct.  BWM of North America, Inc. v. Gore, 116 S. Ct. 1589, 1598-99 (1996); see Pulla v. Amoco Oil Co., 72 F.3d 648, 659 (8th Cir. 1995) (White, J.).  Nash Finch's conduct was reprehensible and involved retaliation and at least reckless disregard of federal protected rights.  It did not involve violence or the threat of violence, but it did involve trickery or deceit.  The ratio or relationship between the reduced punitive damages award and the actual harm inflicted

as measured by the reduced amount of back pay and compensatory damages is a relatively unremarkable 3:1. See BMW of North America, Inc. v. Gore, 116 S. Ct. at 1602 (noting 4:1 ratio of punitive damages to compensatory damages was described as "close to the line" in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 23-24 (1991), and that relevant ratio was not more than 10:1 in TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 462 (1993)); Kimzey v. Wal-Mart Stores, Inc., 107 F.3d at 577-78 (reducing punitive damages award from $5 million to $350,000, an amount 10 times the actual damages award of $35,000, which the court described as "low"). Finally, Title VII, which authorizes or imposes liability for comparable misconduct, caps compensatory and punitive damages at $300,000 (for the largest employers). 42 U.S.C. § 1981a(b)(3)(D); see, e.g., Rush v. Scott Specialty Gases, Inc., 930 F. Supp. at 202 (reducing punitive damages award from $3 million to $300,000). We think a $300,000 punitive damages award is an adequate sanction and sufficient to deter future similar conduct, considering the size and assets of Nash Finch.

CONCLUSION

In sum, we hold the district court should have granted the motion to amend the pleadings to conform to the evidence and thus should not have applied the Title VII cap, 42 U.S.C. § 1981a(b)(3), to limit compensatory and punitive damages. We also hold the district court did not err in holding the November 1990 failure-to-promote claim was actionable under 42 U.S.C. § 1981 under Patterson, there was sufficient evidence of intentional discrimination and retaliation, and there was sufficient evidence of malice or reckless indifference to support

punitive damages. Finally, we hold the awards of back pay and compensatory and punitive damages, as reduced by the district court, were supported by sufficient evidence and were not excessive.

Accordingly, we affirm the judgment of the district court.

BEAM, Circuit Judge, concurring in part and dissenting in part.

I concur in the result reached by the court and in the opinion of the court except that I do not agree that the evidence was sufficient to submit the issue of punitive damages to the jury. Thus, any award for punitive damages was error. Since, as noted by the court, "[i]t is not possible to ascertain what portion of the $300,000 [award] is attributable to compensatory or punitive damages," infra at 33, I would assume, for purposes of analysis, that the entire amount was for compensatory purposes. Accordingly, my bottom line of damages is the same as that of the court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.